**D & J COMPANY, Appellant,**

v.

**STUART, d.b.a. One Hour Martinizing of Toledo, et al., Appellees.**

[Cite as *D & J Co. v. Stuart* (2001), 146 Ohio App.3d 67.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–00–1357.

Decided Sept. 14, 2001.

68

*Charles E. Bloom,* for appellant.

*C. Randolph Light,* for appellees.

SHERCK, Judge.

This appeal comes to us from a decision issued by the Lucas County Court of Common Pleas in a dispute involving the interpretation of a commercial lease. Because we conclude that the trial court properly granted appellees' motion to dismiss, we affirm.

Appellant, D & J Company, Inc., sought reimbursement from appellees, Mace L. Stuart and Frederick Freer, d.b.a. One Hour Martinizing of Toledo and O.H.M., Inc., of Toledo, for soil testing and environmental insurance costs. Appellees operated a dry-cleaning business in a "strip mall" owned by appellant. Appellant sought to refinance several of its properties, including the shopping center. The chosen lender, Boston Finance, required payments of $3,639 for site testing and $25,614 for a five-year environmental insurance policy as conditions to completion of the loan. Appellant claimed that, pursuant to the lease terms, it was entitled to reimbursement of these costs from appellees because they were allegedly incurred as a result of chemical spills in appellees' dry-cleaning business. Appellees refused to pay, disclaiming any responsibility for such costs.

Appellant filed the instant action, claiming damages for appellees' alleged breach of the lease. After appellant presented its case-in-chief, appellees moved for dismissal pursuant to Civ.R. 41(B)(2). The trial court dismissed the case against O.H.M., Inc., of Toledo, finding that the corporation was not a party to the lease agreement. The court also granted dismissal as to appellees, finding that the charges for the site study and environmental insurance were incurred as a result of appellant's choice to refinance several of its properties rather than as a result of any acts by appellees. The court further found that the unambiguous language of the lease agreement did not include indemnification for such costs.

Appellant now appeals, setting forth the following three assignments of error:

"1. First Assignment of Error.

"The Trial Court improperly found Paragraph 37 of the subject lease did not require reimbursement for costs incurred for environmental insurance, because paragraph 37 relates to Appellee's [*sic*] commitment to obtain fire and other casualty insurance to cover replacement of personality and leasehold fixtures

damaged, and further, the Trial Court improperly found the cost of the Environmental Insurance is subject to being prorated among all of the Tenants.

"2. Second Assignment of Error.

"The Trial Court improperly found Appellees were not the proximate cause of the loss sustained by Appellant arising from its purchasing Environmental Insurance to indemnify Appellants and its lenders against environmental claims arising from Appellee's use of the premises.

"3. Third Assignment of Error.

"The Trial Court improperly found paragraph 15 of the lease did not prohibit Appellee from releasing PCE into the environment as long as the release was not subject to remediation pursuant to State and/or Federal law."

We will address all three assignments together. Essentially, appellant claims that the trial court's dismissal improperly determined that, under the terms of the lease, appellees are not required to pay for the costs of the site testing and subsequently purchased environmental insurance incident to appellant's refinancing of the shopping center.

Civ.R. 41(B)(2) provides that, in a nonjury trial, the trial court may grant a motion to dismiss at the close of the plaintiff's case, if, upon the facts and law presented, the plaintiff has shown no right to relief. See *Dumbauld v. Rudolph* (Dec. 22, 2000), Wood App. No. WD–00–026, unreported, 2000 WL 1867259. Civ.R. 41(B)(2) allows the trial court to weigh the evidence in rendering judgment. *Johnson v. Tansky Sawmill Toyota, Inc.* (1994), 95 Ohio App.3d 164, 167, 642 N.E.2d 9; *Levine v. Beckman* (1988), 48 Ohio App.3d 24, 27, 548 N.E.2d 267. A dismissal pursuant to Civ.R. 41(B)(2) will be reversed by an appellate court only when the trial court's ruling is erroneous as a matter of law or is contrary to the manifest weight of the evidence. *Johnson v. Tansky Sawmill Toyota, Inc.,* *supra.*

In this case, the facts are undisputed and the parties agree that the language of the lease is unambiguous. Therefore, our review is limited to whether the trial court's reading of the lease language was erroneous as a matter of law. Having thoroughly reviewed the record and applicable law in this case, we conclude that dismissal was proper, as indicated by the trial court's appropriate and lawfully correct discussion of the facts and law involved in this dispute. We therefore adopt as our own the trial court's decision and judgment entry of October 26, 2000 (see Appendix A).

Appellant's three assignments of error are not well taken.

The judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.

*Judgment affirmed.*

MARK L. PIETRYKOWSKI, P.J., and PETER M. HANDWORK, J., concur.

## APPENDIX A

## COURT OF COMMON PLEAS, LUCAS COUNTY, OHIO

### Case No. CI00–1081

JUDITH ANN LANZINGER, Judge.

This matter came on for hearing before the court on September 22, 2000. At the conclusion of plaintiff's case-in-chief, defendants moved for a dismissal of the action under Ohio Civil Rule 41(B)(2). The court granted the motion and entered its order for findings of fact and conclusions of law from the parties. Having heard the testimony and considered the exhibits entered into the record on behalf of plaintiff, as well as having considered the proposed findings of fact and conclusions of law filed by each, the court determines the following:

## FINDINGS OF FACT

1. Plaintiff, D & J Company ("D & J"), is an Ohio general partnership. Defendants as named in the amended complaint are Mace L. Stuart ("Stuart") and Frederick Freer ("Freer"), d.b.a. One Hour Martinizing, and OHM, Inc., an Ohio corporation, d.b.a. OHM of Toledo. The correct name of defendant OHM, Inc., is O.H.M. of Toledo, Inc. ("OHM").

2. D & J owns and operates a shopping plaza located at 6710 West Central Avenue in Sylvania Township, Lucas County, Ohio, since its construction in 1987. The shopping plaza is situated on a site of approximately 5.4 acres and has a common one-story retail and commercial "strip mall" structure with multiple store front units, facing a paved parking lot with an alleyway behind it.

3. On July 1, 1988, D & J entered into a written lease agreement with "MACE L. STUART AND FREDERICK FREER, d/b/a One Hour Martinizing of Toledo, Ohio" ("1988 Lease Agreement"–Pl. Ex 1). The 1988 Lease Agreement was prepared by D & J's legal counsel. Pursuant to the 1988 Lease Agreement, D & J leased to defendants Stuart and Freer building space of approximately 1,200 square feet at the shopping plaza effective as of October 1, 1988. This space is referenced as the "Demised Premises." This type of agreement is commonly referred to as a "Triple Net Lease" because the lessee pays as an addition to its basic rent a pro rata share of the overall maintenance,

tax, and insurance expenses attributable to the shopping plaza as a whole. The pro rata share of defendants Stuart and Freer under the 1988 Lease Agreement is 2.8%.

4. Paragraph 3 of the 1988 Lease Agreement provides that the "Demised Premises is to be used solely by Lessee for the purpose of dry cleaning services to the general public, and for no other purpose." Paragraph 44(e) of the 1988 Lease Agreement provides that the "Lessor * * * grants Lessee an exclusive [sic] in the Shopping Center for retail dry cleaning operations." Defendants Stuart and Freer have continuously occupied the Demised Premises for the operations of OHM since October 1, 1988 through the present time.

5. In the summer and fall of 1997, D & J for its own business reasons underwent a refinancing that involved the shopping plaza as collateral. After conducting an investigation, D & J selected Boston Capital Mortgage Company Limited Partnership ("Boston Capital") as its lender for the refinancing. The refinancing resulted in D & J consolidating three "recourse" loans totaling about $1,644,430 with interest rates of 7.5%, 9%, and 9.5% with Capital Bank of Toledo into one "non-recourse loan" of about $1,900,000 with a single interest rate of 8.05% with Boston Capital. The loan with Boston Capital was for ten years, and the mortgage broker retained by D & J to act on its behalf in the transaction recommended the loan with Boston Capital to be a favorable one.

6. Boston Capital resells its mortgages on the secondary mortgage market for a profit. To obtain the current interest rate, D & J and Boston Capital entered into an agreement for the reservation by Boston Capital of the borrowed funds prior to the closing of the transaction. In consideration of reserving the borrowed funds and, thus, "locking in" the current interest rate, D & J agreed that if a closing of the loan were not held, it would pay Boston Capital a "hedge fee" of approximately $80,000 for the costs that Boston Capital would incur because of the canceled closing and the termination of the borrowed fund reservation and would also reimburse Boston Capital's actual cost.

7. As preliminary steps in its transaction with D & J, Boston Capital retained TolTest, Inc., ("TolTest") of Toledo, Ohio to conduct an environmental site assessment known as a Phase I Study. This assessment consisted primarily of a visual inspection of the site and a review of public documents relating to the historical use of the property. TolTest completed the Phase I site assessment around the first part of July 1997 and issued a written report of its Phase I site assessment ("Phase I Report"–Pl. Ex 4) to Boston Capital. In this Phase I Report, TolTest stated that "[t]he site and site vicinity are serviced by municipal water," that this service is provided "by the City of Toledo," that "[n]o known public or private drinking water wells are located on or within an approximately

one-half mile of the subject site," and that "[n]o wells or cisterns were identified to be currently or were formally located at the site." Phase I Report at 1, 7, and 20. No evidence was offered that any public or private drinking water or other wells and cisterns existed beyond one-half mile of the site.

8. The Phase I Report stated that there were no violations of the Resource Conservation and Recovery Act (Section 6901 *et seq.*, Title 42, U.S.Code) ("RCRA") at the site, that "[t]here were no non-compliance issues" as well at the site and that no "regulatory reporting" was recommended. Phase I Report at 1, 28, and 29. Although it also stated at 16 that there was no observation of any significant staining at the OHM facility, TolTest recommended at 29 that in order "[t]o address the potential for the handling of the on-site dry cleaning solvents to have impacted the subject site * * * a subsurface [Phase II] investigation be performed to evaluate the soil and groundwater quality in the vicinity" of the OHM facility. As a result, in August 1997, Boston Capital retained TolTest to conduct a Phase II environmental site assessment of soil and groundwater samples taken on and near the OHM facility.

9. Shortly before August 2, 1997, and the Phase II assessment, D & J advised defendants Stuart and Freer that it wanted them to pay for the testing to be done by TolTest at the OHM facility. Defendant Stuart on August 2, 1997, informed D & J that they would not pay for the testing until their attorney advised them differently.

10. The Ohio Environmental Protection Agency ("OEPA") conducted a random compliance evaluation inspection of the OHM facility at the shopping plaza on August 23, 1997. The OEPA sent defendant Stuart a letter, dated August 26, 1997 (Pl. Ex. 9), advising him that "[n]o violations of Ohio's hazardous waste regulations were noted during the inspection."

11. On August 27, 1997, TolTest issued Boston Capital a written report on its Phase II environmental site assessment of the OHM facility ("Phase II Report"– Pl. Ex. 7). The report explains that TolTest took two "Geoprobe" borings, designated "GP–1" (approximately ten feet north of a garage door in back of the OHM facility) and "GP–2." (approximately ten feet south of a sidewalk in front of the OHM facility). A four-inch diameter concrete coring device was used to core through the concrete flooring inside the OHM facility. The boring was taken at a point north of the dry cleaning machine and designated "SP–1." TolTest also took one "field blank" for the analysis of volatile organic compounds ("VOCs"). TolTest collected soil samples from GP–1, GP–2, and SB–1, and groundwater samples from GP–1 and GP–2. It did not take a groundwater sample from SB–1, since it failed to encounter any groundwater there at the point of "auger refusal,"

three feet below the bottom of the concrete floor in the OHM store. Phase II Report at 5.

12. In its Phase II Report to Boston Capital, TolTest stated that it did not find any violations of RCRA at the OHM facility. Phase II Report at 1. It also stated that it did not observe in the boring and auger cuttings any "visual or olfactory (*i.e.*, staining or odor) evidence of adverse impacts." Phase II Report at 6. As a result of its soil sampling, TolTest stated the following at 6:

"The laboratory analytical results indicate that low concentrations of cis–1, 2–dichloroethylene (0.063 ppm). PCE [perchloroethylene, aka 'PERC'' and 'tetra-chloroethylene'] (0.098 ppm), and trichloroethylene (TCE) (0.017 ppm) were present in the soil sample from GP–1. VOCs were below method detection limits in the soil sample from GP–2. Low levels of PCE were detected in the soil sample from boring SB–1 at a concentration of 0.855 ppm. VOC analysis of the 'field bank' detected no compounds above method detection limits. There are no state or federal soil cleanup standards."

13. As a result of its groundwater sampling, TolTest stated the following in its Phase II Report at 6:

"Low concentrations of cis–1, 2–dichloroethylene (3.1 ppb), PCE (8.3 ppb), and TCE (9.8 ppb) were detected in the ground-water samples from GP–1. These PCE and TCE concentrations exceed their respective federal Maximum Contaminant Levels of 5.0 ppm. There are no state ground-water cleanup standards. VOC concentrations in the water sample from GP–2 were below method detection limits."

The reference to "5.0 ppm" as set forth is incorrect. The reference should be to "ppb" or parts per billion and not "ppm" or parts per million.

14. After learning of the two PERC and TCE groundwater readings, Boston Capital informed D & J that it would have to pay for the premium cost of environmental insurance placed on the shopping plaza or that D & J would have to "clean up" the PERC and TCE groundwater readings in issue. The commercial loan officer of Boston Capital involved with the D & J loan testified that by the term "clean up," Boston Capital was referring to what the law required. Boston Capital further advised D & J that if it neither purchased environmental insurance nor cleaned up the TCE and PERC, that Boston Capital would cancel the closing on the loan and require D & J to pay Boston Capital the agreed-upon hedge fee. D & J elected to pay Boston Capital for the environmental insurance premium and to proceed with the closing of the loan that it found to be highly beneficial to it. Defendants disputed any responsibility for these costs.

15. On October 10, 1997, D & J closed on its refinancing with Boston Capital. At the closing, D & J reimbursed Boston Capital for the cost that Boston Capital

had incurred for having a Phase II site assessment conducted by TolTest at the shopping plaza. At the closing, D & J also paid a premium of a five-year environmental insurance policy that Boston Capital had required. The insurance policy relates to the entire D & J plaza. The cost of the Phase II site assessment was $3,638.62, and the cost of the environmental insurance premium was $25,614.75. The sum of the two payments by D & J to Boston Capital was $29,253.37 (Pl. Ex. 10). D & J also paid the amount of $5,318.82 for one month of hazard insurance. D & J did not attempt to place its refinancing with another lender in order to avoid these payments.

16. Shortly after its October 10, 1997 closing with Boston Capital, D & J informed the defendants that it wanted them to reimburse it for its payment of the premium of the five-year environmental insurance policy that had been required by Boston Capital. Defendants rejected this demand. D & J did not offer any evidence that the defendants violated any federal, state, or municipal law, rule, or regulation or that they are subject to any environmental cleanup or remediation order of any governmental entity.

17. On January 16, 1998, D & J filed a lawsuit against defendants. Among other claims, it demanded reimbursement of its Phase II site assessment and environmental insurance premium charges from the defendants. On December 14, 1999, D & J voluntarily dismissed the case. On January 11, 2000, D & J refiled its case, now numbered CI00–1081.

18. D & J set forth three causes of action in the amended complaint. As its first cause of action, D & J asserted that defendants breached Paragraphs 10, 17 and 37 of the 1998 Lease Agreement by not reimbursing D & J for its October 10, 1997 payment of $29,253.37 to Boston Capital for the Phase II site assessment and environmental insurance premium charges, and reimbursement for reasonable attorney fees and costs. As its second cause of action, D & J asserted a claim for diminished property value against the defendants. This claim was voluntarily dismissed by plaintiff before trial. As its third cause of action, D & J requested an order from the court, requiring the defendants to cease allegedly polluting the property of D & J and the adjoining land, to clean up the pollution that they have allegedly caused, and to install a dry-cleaning system that will not pollute.

## CONCLUSIONS OF LAW

The standard that governs defendants' motion for a dismissal under Civ. R. 41(B)(2) is whether upon the facts and the law the plaintiff D & J has shown no right to relief. Each cause of action will be discussed in turn.

### First Cause of Action

This cause is based upon contract and the court finds that Paragraphs 10, 15, 17, and 37 of the 1988 Lease Agreement do not require defendants to reimbursement D & J for its payment of the Phase II site assessment and the environmental insurance premium charges of Boston Capital.

Even when the evidence offered by plaintiff D & J is construed most strongly in its favor, defendants are not liable under the 1988 Lease Agreement to reimburse D & J for its payment of the Phase II site assessment and the environmental insurance premium charges made October 10, 1997, for these charges arose as a direct and proximate result of the refinancing by D & J and the related activities and requirements of Boston Capital rather than as a direct and proximate result of the conduct of defendants. Boston Capital retained TolTest to perform the Phase II site assessment for the "intended * * * sole use" of Boston Capital and its affiliates in conjunction with D & J's refinancing. Boston Capital required the purchase of the environmental insurance policy. For its own part, D & J chose to pay the Phase II assessment and insurance premium charges to obtain a favorable loan from Boston Capital. In the absence of the refinancing of D & J and the related requirements of Boston Capital, the costs of the Phase II site assessment and the environmental insurance policy premium charges would not have arisen. Thus, the proximate cause of these costs is the acts of D & J and Boston Capital, and not the conduct of the defendants Stuart and Freer.

██ At the outset it is noted that clear and unambiguous language of a document governs. *Logsdon v. Fifth Third Bank* (1994), 100 Ohio App.3d 333, 339, 654 N.E.2d 115. The 1988 Lease Agreement has the signatures of only defendants Stuart and Freer. Defendant OHM is not a party to the 1988 Lease Agreement and, as such, is not liable for any of the costs for which D & J demands reimbursement under the agreement. Even if it were a party to the 1988 Lease Agreement, defendant OHM would still not be liable for these costs for the same reasons that defendants Stuart and Freer are not liable.

The 1988 Lease Agreement does not require the reimbursement demanded by D & J. The four lease provisions cited by plaintiff to support its claims are Paragraphs 10, 15, 17, and 37. Each paragraph cited by plaintiff contains the element of proximate cause but not one of these three lease provisions has been triggered by any activity of the defendants that compels them to reimburse D & J for the costs in issue.

██ *Paragraph 10* refers to the lessee not using the Demised Premises "contrary to law" or "in any manner deemed extrahazardous on account of fire or otherwise, or so as to increase the cost of fire and other hazard insurance over

and above the normal cost of such insurance for the type and location of the Demised Premises." There is no evidence by D & J that the defendants have used the demised premises unlawfully, in violation of any pertinent environmental law, rule, or regulation, or in any manner deemed extrahazardous, or that there has been an abnormal increase in "the cost of fire and other hazard insurance." In this regard, D & J paid the hazard insurance policy charge at its October 10, 1997 closing with Boston Capital and has not sought reimbursement of this payment from the defendants.

■ *Paragraph 15* of the 1988 Lease Agreement sets forth the covenant that the lessee "will use, maintain and occupy the Demised Premises in a careful, safe, lawful and proper manner and will not commit waste" on the demised premises. There is no evidence by D & J that the defendants have engaged in any unlawful activity or in any other conduct that has caused a substantial or permanent injury to the demised premises.

As support for its claim that the defendants have breached Paragraph 15 of the 1988 Lease Agreement and, thus, owe it for its payment of the Phase II site assessment and environmental insurance premium charges of Boston Capital. D & J points to two matters: one is the soil reading of "[l]ow levels" of a concentration of 0.855 ppm of PERC taken by TolTest from its auger boring in the OHM facility. Phase II Report at 6. The other consists of the PERC and TCE groundwater readings detected by TolTest from the driveway boring behind the demised premises. The PERC soil reading is not only less than the commercial land use soil standard of 490.00 ppm permissible under Table III of Ohio Adm.Code 3745–30–08, but also is less than the residential land use PERC standard of 94 ppm permissible under Table II of the same OAC regulation. (The mg/kg values under the two tables are equivalent to ppm. See "Report Key" contained in Phase II Report at 9.) There are no federal or state standards requiring a cleanup of the PERC soil concentration found by TolTest. Phase I Report at 6. The evidence offered by D & J does not prove that by this PERC soil concentration, the defendants have used, maintained, or occupied the demised premises in a careless, unsafe, unlawful, or improper manner or that they have committed waste on the demised premises.

The PERC and TCE groundwater readings involved relate to the "maximum contaminant level" standard. This standard is a public drinking water standard that has no application to the present case; the shopping plaza of D & J is served by the city of Toledo's public drinking water.

The United States Environmental Protection Agency ("USEPA") and Ohio Environmental Protection Agency ("OEPA") define "maximum contaminant level" to mean "the maximum permissible level of a contaminant in water which is

delivered to any user of a public water system." See Section 141.2, Title 40, C.F.R., and Ohio Adm.Code 3745–81–01(SS). Both agencies define a "public water system" similarly. USEPA states that a public water system is "a system for the provision to the public of water for human consumption through pipes or, after August 5, 1998, other constructed conveyances, if such system has at least fifteen service connections or regularly serves an average of at least twenty-five individuals daily at least 60 days out of the year." Section 141.2, Title 40, C.F.R. See Ohio Adm.Code 3745–81–01(AAA) for OEPA's definition.

OEPA has expressly stated that the 5.0 ppb groundwater standard set for PERC and TCE has been formulated on "the assumption that the ground water underlying the property will be used as a source of water for drinking, cooking, showering and bathing." Ohio Adm.Code 3745–300–08(C)(2). There is no evidence that the groundwater sampled by TolTest as part of its Phase II site assessment or that is otherwise beneath the shopping plaza of D & J is either used, or is likely to be used, for human consumption or other use in a public or private water system.

In its Phase I Report, TolTest found that the city of Toledo supplies the water to the D & J shopping plaza and the surrounding area. TolTest also found that there are no public or private drinking water wells within approximately one-half mile of the shopping plaza. There is no evidence that such wells exist beyond that limit.

██ *Paragraphs 17 and 37* of the Lease Agreement set forth indemnification clauses. Paragraph 17 provides that the lessee shall indemnify the lessor for "all loss, cost, injury, damages, death, liability, suit, claims, judgments and liens" caused by the lessee. Paragraph 37 provides that the lessee shall indemnify lessor for "loss, damage or liability" caused by the lessee. The defendants have not caused any of these matters to be incurred by D & J.

D & J did not have a legal obligation to pay the charges of Boston Capital for the Phase II site assessment and for the environmental insurance policy premium. D & J made the payment freely and in its own self-interest.

*Paragraph 37* refers to indemnification in the context of insurance and addresses only matters for indemnification that have actually been incurred as a "loss, damage or liability." D & J does not present a legal claim or judgment of a third party as the basis for its reimbursement demand. Instead, D & J presents two expenditures that it voluntarily elected to assume for its own best interest in obtaining a favorable loan from Boston Capital. These self-imposed expenditures do not fall within the items of indemnification actually or likely to be incurred as a legal obligation that are described in Paragraph 37 as well as in Paragraph 17

of the 1988 Lease Agreement. As stated in 42 Corpus Juris Secundum, Indemnity, Section 23, at 112:

"[A] * * * contract of indemnity does not protect the indemnitee against loss through a payment which is entirely voluntary on his part, in the sense that there is no legal obligation on him to make it unless such payment is made with the knowledge and approval of the indemnitor."

The exception that permits the indemnification of a voluntary payment is inapplicable in the present case. The defendants objected to the charges in issue as soon as they had learned of them. They objected to the Phase II site assessment charge before the October 10, 1997 refinance closing of D & J. The evidence presented by D & J shows that it made the payment in issue on its own volition and without any misconception as to the position of the defendants.

*Paragraph 37* also does not support the reimbursement claim because it relates to the lessee's commitment to obtain fire and other casualty insurance to cover the replacement costs of furniture, fixtures, leasehold improvements, inventory, and equipment, including glass forming a part of the demised premises. These items are not involved in the present case. Second, Paragraph 37 addresses a pro rata sharing of liability, casualty, and other insurance costs by all of the lessees at the shopping plaza. This allocation of costs among all of the shopping plaza tenants expressly invalidates the demand of D & J for a full reimbursement by the defendants for the cost of the environmental insurance policy premium. Finally, Paragraph 37 addresses the increase in an insurance rate "over the existing rate" previously in effect at the time of the 1988 Lease Agreement. The environmental insurance policy in issue, however, is a new matter not covered by or in effect at the commencement of the 1988 Lease Agreement.

On the evidence presented by D & J, it can only be concluded that the defendants are not contractually obligated under the 1988 Lease Agreement to reimburse D & J for its payment of the Phase II site assessment and the environmental insurance premium charges which it made at the October 10, 1997 closing of the refinancing of its shopping plaza with Boston Capital.

### Second Cause of Action

The second cause of action was voluntarily dismissed by plaintiff before trial.

### Third Cause of Action

The third cause of action seeks injunctive relief. Even construing the proof offered by D & J most strongly in its favor, it is not entitled to the court order that it seeks.

■ D & J seeks the injunctive relief of a court order compelling defendants to cease and desist from allegedly contaminating its property, to remove the alleged contamination from the property, and to install a dry-cleaning system that will not pollute. The issuance of an injunction, however, requires proof of each necessary element for its issuance by clear and convincing evidence. The record presented by D & J is devoid of such proof. As the Ohio Court of Appeals for Lucas County stated in *Restivo v. Fifth Third Bank* (1996), 113 Ohio App.3d 516, 520, 681 N.E.2d 484:

■ "The decision as to whether an injunction should be granted depends on the specific facts and circumstances of a given case. *Cullen v. Milligan* (1992), 79 Ohio App.3d 138, 140, 606 N.E.2d 1061, The trial court retains broad discretion when framing the terms of an injunctive order. *Superior Sav. Assn. v. Cleveland Council of Unemp. Workers* (1986), 27 Ohio App.3d 344, 346, 27 OBR 402, 501 N.E.2d 91, * * * [Before an injunction will] issue, it must be shown that such relief is necessary to protect a clear right from irreparable injury, where the remedy at law is inadequate. 'The right to an injunction must be clear and the proof thereof clear and convincing * * *.' *White v. Long* (1967), 12 Ohio App.2d 136, 140, 41 O.O.2d 200, 231 N.E.2d 337. As noted by *Miller v. W. Carrollton* (1993), 91 Ohio App.3d 291, 296–297, 632 N.E.2d 582:

" 'The facts which will warrant mandatory relief must be clear, be free from reasonable doubt, and disclose the prospect of irreparable injury to the complainant. Equity will not interfere where the anticipated injury is doubtful or speculative; reasonable probability of irreparable injury must be shown. Such relief will be refused where the injury is so slight as to bring the case within the maxim "de minimis non curat lex," where there is no appreciable damage, where a mandatory decree would require a difficult and expensive act, or where its enforcement would necessitate close and continuous supervision by the court for an indefinite period. As in other cases of injunction, the court will balance the equities between the parties and consider the benefit to the plaintiff of a mandatory writ as against the inconvenience and damage to the defendant, and award relief accordingly.' "

There is no proof offered by D & J that the defendants are violating governmental law, rule, or regulation or that there is present any hazard to public health and welfare or to the environment. There are no RCRA violations by the defendants at the shopping plaza of D & J; there are no "non-compliance issues"; there is no recommended "regulatory reporting." OEPA did not find any violations of Ohio's hazardous waste regulations during its August 13, 1997 inspection of the OHM facility and no evidence of any such violation was offered at trial. The PERC soil reading and the PERC and TCE groundwater readings

of TolTest cited by D & J in support of its requested court order are readings that do not apply to the present case because the groundwater underneath the shopping plaza of D & J is neither used nor is likely to be used for human consumption or for other use in a public or private water system or in any other manner. As the court said in *Two Rivers Terminal v. Chevron USA, Inc.* (Mar. 27, 2000), M.D.Pa. No. CV–97–1595, unreported, at 29: "The fact that no one is drinking this water eliminates it as a threat to health or the environment."

In sum, the court concludes that even after construing the evidence of D & J most strongly in its favor, upon the facts and the law D & J has shown no right to relief. Accordingly, the motion of the defendants for a dismissal of the action is granted.

### JUDGMENT ENTRY

For the foregoing reasons, it is ORDERED that defendants are entitled to judgment in its favor on all claims asserted in the complaint. The complaint is hereby dismissed with prejudice and at plaintiff's costs.

This is a FINAL APPEALABLE ORDER, no just cause for delay.

*Judgment for defendants.*